UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


LARRY McCLAIN,

        Petitioner,

                                CASE NO. 10-10115
v.                                  HONORABLE VICTORIA A. ROBERTS

NICK LUDWICK,

        Respondent.

_____/

## OPINION AND ORDER
## DENYING THE HABEAS CORPUS PETITION,
## GRANTING IN PART A CERTIFICATE OF APPEALABILITY,
## AND GRANTING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL

Petitioner Larry McClain filed a *pro se* habeas corpus petition on January 12,

2010. The habeas petition challenges Petitioner's Eaton County conviction for first-

degree home invasion, Mich. Comp. Laws § 750.110a(2). Petitioner claims that the

evidence adduced at trial was insufficient to support his conviction and that his trial and

appellate attorneys were ineffective. Because the state appellate court's adjudication of

these claims was objectively reasonable, the Court denies the petition. A procedural

history and discussion follow.

### I.  BACKGROUND

Petitioner was charged with first-degree home invasion, assault with intent to

commit murder, and possession of a firearm during the commission of, or attempt to

commit, a felony (felony firearm). The charges arose from a home invasion and

shooting at a residence in Lansing, Michigan on October 23, 2006. The resident,

James Shaun Snell (Snell), was shot during the incident, as was Petitioner's co-defendant, Israel Goodin (Goodin), who pled guilty to the same three crimes with which Petitioner was charged.  Goodin testified against Petitioner at trial.

Petitioner was tried before a jury in Eaton County Circuit Court.  The prosecutor's theory was that Snell's residence was a drug house and that, on October 23, 2006, Petitioner and Goodin armed themselves, broke into the drug house with intent to take money, drugs, and jewelry, and then shot Snell.  The defense theory was that Petitioner merely dropped Goodin off at Snell's house so that Goodin could buy drugs.  Petitioner claimed that he was not present during the home invasion and shooting.

The state court accurately summarized the facts and the testimony of key witnesses:

### A. Lawrence Dunn's Testimony

Lawrence Dunn testified that he has been a friend of James Snell for over 25 years and that at about 10:45 p.m. on October 23, 2006, he went to James Snell's house in Lansing, Michigan to watch Monday Night Football.  Dunn stated that when he arrived, James Snell's nephew, Marcus Boles, was there, but he left at approximately 11:15 p.m., with James Snell's son, Ryan Maurice Bentley.  About five minutes later, according to Dunn:

> I'm teasing Snell about how the Cowboys are getting blowed out.  And, I don't even think he could get the word out and we heard a big boom, you know, the door hit . . . .  [Snell] was over to my left.  So I looked at him and his eyes was real big.  And, so then I reacted. I just jumped up off the couch and ran and dove behind the bar. . . .  I heard a guy coming down the steps, 'cause that was right there to my left. And, I heard footsteps, you know, stomping upstairs, like a guy running through upstairs with a bunch of people.... I heard the guy say "Metro," or "police," and then he took another step or so down the steps.  And one of the guys hollered, I told ya I'd be back, or some of them words . . . .  And, I dove and closed my eyes.  And, I just laid there, you

know, 'cause I didn't know whether the police or whoever it
might have been.  Then I heard shots.  I heard several shots.

Dunn did not see who did the shooting because he had his eyes closed
and was praying.  About five minutes after the shooting stopped, Dunn
noticed shell casings all over the floor and then saw James Snell, down on
his knees, at the top of the stairs.  Dunn lifted James Snell up and took
him to the hospital.  Dunn testified at trial that he was not aware that
James Snell was involved with drugs, and he did not notice the security
cameras stationed around James Snell's house.  Dunn also said that he
did not see James Snell with a gun on the evening of the shooting.

### B. James Snell's Testimony

James Snell testified that he invited Dunn over on the evening of October
23, 2006.  According to James Snell, Dunn got to the house between
10:00 and 10:30 p.m.  About 20 minutes later, Bentley came home from
work. Bentley and Boles then left the house together, and James Snell
believed they were headed to the store.

James Snell, a diabetic, testified that, at the time of the shooting, he was
temporarily blind, and although he could see shadows, he could see very
little movement.  He said that shortly after Bentley and Boles left,
someone kicked in the back door and yelled out "five-O," which James
Snell understood to mean "police."  James Snell wanted to jump behind
the bar, but Dunn was already there, and the intruders had started firing.
So, he grabbed a 45-caliber semiautomatic weapon that he kept behind
the bar and returned fire.  James Snell believed that two people had come
into the house because, while he was exchanging fire in the basement, he
heard someone else running upstairs.  James Snell emptied his gun and
heard someone say, "I'm hit."  But the intruder continued to fire his
weapon, and James Snell was struck.

James Snell stated that he managed to go up to the kitchen and then his
bedroom in an attempt to find a phone.  He also went outside on the back
deck and yelled for help.  According to James Snell, when he went back
inside the house, Dunn found him, and took him to the hospital. James
Snell testified that he had been shot seven times and spent three months
in the hospital.  He also reported that a herringbone necklace and a ring
were taken during the incident.

James Snell stated that he did not know McClain or anyone named Israel
Goodin.  He said that he had $2,000 in cash on his person that evening
because he had planned to give it to his fiancée so that she could buy
some furniture.  He did not think that he had as much as $4,000 and was

3

not aware that officers found cocaine in his bedroom drawer, which was locked. He was further unaware that there was a digital scale and a razor blade on top of his refrigerator. James Snell explained the presence of multiple boxes of baking soda by saying that he used baking soda to brush his teeth, clean out the garbage disposal, and deodorize the refrigerator. He denied that his home was equipped with a security system, yet explained that cameras wired to a monitor in his bedroom were installed as a result of an incident when two men entered the house. James Snell said that he had a flak jacket and bulletproof vest for protection when he worked at his music promotion business; he would wear them when he set up parties for shows because often the shows were in "rough" areas. He said that he kept a 45-caliber gun, a nine-millimeter gun, and a shotgun in his house for protection, but he did not know why anyone would break into his house and try to kill him.

### C. Marcus Boles' Testimony

On October 23, 2006, Marcus Boles arrived at James Snell's residence at approximately 7:30 p.m. After Dunn arrived to watch the Monday Night Football game, Boles and Bentley left to go to the store. Boles said that they were gone for several hours and, when they returned to the house, he noticed that the backdoor looked as though it had been kicked in and the doorknob was twisted. In the basement, Boles observed "blood everywhere," clothes scattered about, furniture flipped over, and shell casings on the floor. James Snell's bedroom door had also been kicked in. Boles picked up an unfamiliar cell phone lying on the floor by the bathroom upstairs.

Boles' mother then called to tell him that James Snell had been taken to the hospital. At the hospital, Boles gave the cell phone that he had discovered to his cousin, Roquelle Snell, who said she would give it to the police. On cross-examination, Boles stated that he did not know McClain, Goodin, or anyone named Ignacio Bermudez. He denied having anything to do with the robbery of James Snell's house.

### D. Roquelle Snell's Testimony

James Snell's niece, Roquelle Snell, testified that her mother called her around midnight on October 23, 2006, and told her that her uncle had been shot. While at the hospital, Roquelle Snell saw her cousins, Boles and Bentley. She stated that they gave her a cell phone, which she attempted to turn on, but it was dead, so she put it in her pocket. Roquelle Snell explained that she wanted to try to charge the phone to see if she recognized any of the numbers on it. Later that evening, Roquelle Snell, her mother, and Bentley went back to James Snell's house to make sure

that it was secure.  Police officers on the scene, however, handcuffed the trio and searched their car.  Several days later, Detective Christopher Burton retrieved the cell phone from Roquelle Snell.

### E. Israel Goodin's Testimony

At trial, Israel Goodin explained that he was testifying pursuant to an agreement with the prosecutor's office in which he pleaded guilty to first-degree home invasion, assault with intent to murder, and felony-firearm, and agreed to help with other cases in addition to McClain's case.  In turn, the prosecutor was to recommend that the judge sentence him toward the lower end of the sentencing guidelines and the judge would consider departing from those guidelines

Goodin testified that he had been McClain's friend for approximately 20 years.  And several weeks before the October 23, 2006, he, McClain, and McClain's girlfriend had discussed the larceny of James Snell's house, which they believed to be a drug house.  According to Goodin, McClain told him that there was a "large amount" of money and drugs in James Snell's house, and that "so much of the money was supposed to be given to the person who informed us of the heist, and that him and I and another individual was going to split the drugs and split the remaining of the money after we gave so much to one person."  The third person to which Goodin referred was Ignacio Bermudez, whom Goodin knew prior to October 23, 2006, because he and McClain used to sell drugs for him.

According to Goodin, in preparation for the robbery, McClain used a stencil to paint "LPD" on the back of a "black correction officer jacket." Goodin explained that "LPD" was intended mean "Lansing Police Department." McClain used a ripped up shirt for a mask.  And both men put on multiple pairs of latex gloves.  McClain wore dark-colored jeans, white basketball shoes, and a shirt with the letters FBI on it.  Goodin put on several layers of dark-colored clothes and had a Velcro ski mask.

According to Goodin, at about 10:00 p.m., he and McClain left in Goodin's car to "commit a larceny."  Goodin and McClain first went to Bermudez's house "to obtain weapons for the robbery and to format [their] plan." McClain used his cell phone to call Bermudez and let him know they had arrived.  McClain then went into the house and came out with two guns wrapped in pantyhose.  Bermudez and another man came outside as well. Goodin did not know the other man, but McClain identified him as Boles. Boles' role was to go into James Snell's house and clear it out so that Goodin and McClain could run in.  Bermudez told Goodin that the only thing he wanted was $10,000 and some jewelry; the rest could be divided between Boles, McClain, and Goodin.

5

Goodin testified that he and McClain then drove to James Snell's house and parked around the corner. They then traveled on foot, through some backyards, jumped a fence, and waited behind James Snell's garage until they saw Boles pull in. Goodin was familiar with James Snell's house because he and McClain had "cased" it on a prior occasion. After Boles left with two individuals, McClain and Goodin entered the house by kicking in the backdoor. When they entered, McClain yelled out "Lansing Police Department," and Goodin shouted, "Eaton County Sheriff's Department." The men then went into the living room and down a hallway, kicking in doors on each side to see if anyone was there.

According to Goodin, he and McClain proceeded to the basement. Goodin stated that he was carrying a smaller gun (he was unsure of the caliber), and McClain was using a nine-millimeter. When they got to the bottom of the steps, they saw James Snell, who started shooting at them. Goodin was hit once in the arm and once in the abdomen. Goodin stated that he then ran towards James Snell and grabbed his hand to keep him from shooting again. The two men struggled as Goodin attempted to disarm James Snell, and James Snell emptied his magazine. McClain ran back upstairs but returned when the shooting stopped. Goodin asked for help, and McClain shot James Snell twice in the back.

Goodin said that he then took James Snell's gun and gave it to McClain, as well as the gun Goodin was carrying. He and McClain then ran out of the house, without looking for drugs or money, believing that the neighbors had to have heard the shooting. The men ran back to the car, and McClain drove Goodin to St. Lawrence Hospital.

Goodin explained that, while he was in the hospital, he was interviewed by the Lansing Police Department and he told the officer that he had been shot by a Hispanic man while walking on Martin Luther King Boulevard. Goodin also spoke to McClain, but they believed the phone to be tapped, so they did not discuss guns or clothing.

Goodin testified that about two weeks after he got out of the hospital, he went to McClain's mother's house, and McClain told him that if the police asked what happened, he should say that he was shot by the same person that shot James Snell. Goodin stuck by his original story of having been shot by a Hispanic man, but later changed his story when he was represented by counsel. On cross-examination, he stated that he told "two or three" different stories and explained that he initially denied having met Bermudez because "Bermudez is a very powerful man on the street. Things happen to people that testify against him."

Goodin identified McClain's cell phone at trial and stated that McClain had

the phone with him on the night of October 23, 2006.  Goodin was not aware that the phone had been lost.  He was also not aware that the phone was broken and maintained that McClain made several calls on it that evening.

### F. Detective Kevin Herald's Testimony

On the evening of October 24, 2006, Detective Kevin Herald, of the Eaton County Sheriff's Department, interviewed McClain at the Delta County substation.  During the interview, McClain stated that he went to Israel Goodin's residence on the evening of October 23, 2006.  According to McClain, after hanging out for a while, he and Goodin went to the north end of Lansing.  McClain told Detective Herald that he dropped Goodin off and then went to the Meijer store on South Pennsylvania (though he then changed his story and said it was the one on West Saginaw) where he stayed for 15 to 30 minutes.  When McClain went back to the north end of Lansing, he noticed Goodin staggering down the street, and Goodin said that he had been stabbed.  McClain said that he dropped Goodin off at the hospital but did not go inside and did not stay.

Detective Herald did not believe McClain's story and asked him about his cell phone.  McClain indicated that he had lost the phone about two weeks earlier and that is how it must have ended up in James Snell's house.  McClain then changed his story and told Detective Herald that Goodin must have taken the phone and that is how it ended up in James Snell's house.  According to Detective Herald, McClain eventually reverted back to his first story, that he had lost the phone two weeks earlier.

### G. Larry McClain's Testimony

Larry McClain took the stand in his defense and denied suggesting to Goodin that they rob James Snell's house.  McClain knew Bermudez because he was a distant cousin, but McClain never sold drugs for him.  McClain stated that he spent most of the day on October 23, 2006, at Goodin's house, "putting some beats together" on the computer.  The men were smoking marijuana, using cocaine, and drinking.  McClain said that he left the house around 9:00 p.m., with Goodin, to get some more cocaine.

According to McClain, the men drove down Waverly and parked the car on a side street.  They then discussed whether McClain should go in the house with Goodin, and they decided that McClain would drive around for a while and then come back and pick up Goodin after about a half hour.  McClain stated that he gave Goodin his cell phone and $20 for his share of the cocaine.  He then drove around for only 20 minutes, because he did

7

not have a license and was afraid of getting pulled over. McClain maintained that he gave the cell phone to Goodin so that Goodin could use it to keep track of time.  McClain further stated that the phone was not working, and he did not make any calls from it that evening.

McClain admitted that he lied when he was questioned by police because he "didn't want to be implicated in anything that had happened." When asked if he knew what had happened, he answered, "No, I don't.  All I know is that he went to go get some dope, and when he came back out to the car, when I was riding down the street, and I picked him up, he was injured, and that's all I knew.  I just knew something had happened to him."  McClain denied that he went to Bermudez's house that evening and denied that he received guns from either Bermudez or Boles.  McClain testified that when he encountered Goodin on the street, Goodin jumped in the car, grabbed McClain's coat, and held it to his stomach.  According to McClain, he then took Goodin to the hospital, dropped him off, and then went back to Goodin's house.

McClain also stated that he did not fire a gun on the night of October 23, 2006.  He denied knowing either Boles or Bentley.  He stated that he did not kick in James Snell's door, rifle through his belongings, or rob his house.  He admitted that he gave the police different stories about what happened and that he went to Columbia, Missouri, about four to five days after police searched his house.  He said that the reason he left the state was because he was scared for the safety of himself and his family. He said that he was in Missouri for about four to five months before he was arrested.

*People v. McClain*, No. 282437, 2009 WL 1067375, at *1-5 (Mich. Ct. App. Apr. 21, 2009).

On October 16, 2007, the jury found Petitioner guilty of first-degree home invasion, but not guilty of assault with intent to commit murder and felony firearm.  On November 16, 2007, the trial court sentenced Petitioner to imprisonment for six to fifteen years for the home invasion.

In an appeal as of right, Petitioner's appellate attorney argued that there was insufficient evidence to prove that Petitioner aided and abetted Goodin in committing first-degree home invasion.  In a *pro se* supplemental brief, Petitioner claimed that his

8

trial and appellate attorneys were ineffective and that Eaton County allocated insufficient funds for the appeals of indigent defendants.  The Michigan Court of Appeals found no merit in Petitioner's claims and affirmed his conviction in an unpublished, *per curiam* opinion.  *See id*.  On September 28, 2009, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues.  *See People v. McClain*, 485 Mich. 897 (2009) (table).

Petitioner filed his habeas corpus petition on January 12, 2010.  He appears to be raising each of the claims that he raised in his appeal as of right.  These claims are: (1) there was insufficient evidence to support Petitioner's conviction; (2) trial counsel was ineffective for failing to (a) call key defense witnesses, (b) object to certain jury instructions and request other jury instructions, and (c) object to the prosecutor's comments; and (3) the funding for indigent defense in Eaton County is inadequate, and appellate counsel was ineffective for failing to raise a claim about trial counsel.  Respondent argues in an answer to the habeas petition that the state court's adjudication of Petitioner's claims was not contrary to, or an unreasonable application of, Supreme Court precedent.

## II.  STANDARD OF REVIEW

The Court may grant a petition for the writ of habeas corpus only if the state court's adjudication of the petitioner's claims on the merits

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

9

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id*. at 409.

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, __ U.S. __, __, 131 S. Ct. 770, 786 (2011). To obtain a writ of habeas corpus from a federal court, a petitioner must show that the state court's decision "was so lacking in justification" that it resulted in "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 786-87.

### III.  DISCUSSION

### A.  Sufficiency of the Evidence

Petitioner alleges that the evidence at trial was insufficient to convict him of aiding and abetting Goodin in committing first-degree home invasion. Petitioner does not dispute that Goodin committed the home invasion or that he (Petitioner) was involved with Goodin on October 23, 2006. Rather, Petitioner asserts that his involvement was limited to dropping off Goodin near Snell's residence, giving Goodin his cell phone and $20 to buy drugs at the house, picking Goodin up after the shooting,

10

and taking Goodin to the hospital for treatment of his injuries.  The Michigan Court of Appeals determined that "there was sufficient evidence from which a rational jury could find McClain guilty beyond a reasonable doubt of first-degree home invasion, as either a principal or as an aider and abettor."  *McClain*, 2009 WL 1067375, at *8.

### 1.  Clearly Established Federal Law

The relevant question on habeas corpus review of a sufficiency-of-the-evidence claim

> is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (internal citation omitted) (emphasis in original).

Courts must apply the *Jackson* standard "with explicit reference to the substantive elements of the criminal offense as defined by state law."  *Id*. at 324, n.16.  The elements of first-degree home invasion have been described as follows:

Element One: The defendant *either*:

1. breaks and enters a dwelling or

2. enters a dwelling without permission.

Element Two: The defendant *either*:

1. intends when entering to commit a felony, larceny, or assault in the dwelling or

2. at any time while entering, present in, or exiting the dwelling commits a felony, larceny, or assault.

11

Element Three: While the defendant is entering, present in, or exiting the dwelling, *either*:

1. the defendant is armed with a dangerous weapon or

2. another person is lawfully present in the dwelling.

*People v. Wilder*, 485 Mich. 35, 43 (2010) (italics in original). To prove that Petitioner aided

and abetted the crimes, the prosecutor had to show that

"(1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement."

*People v. Robinson*, 475 Mich. 1, 6 (2006) (quoting *People v. Moore*, 470 Mich. 56, 67-68

(2004)(quoting *People v. Carines*, 460 Mich. 750, 768 (1999) (alteration in *Moore*).

### 2. Application

Investigators did not find Petitioner's blood, fingerprints, footprints, or DNA at the

crime scene.  (Tr. Oct. 10, 2007, at 224.)  Petitioner, however, concedes in one of his

supporting briefs that his appellate attorney's claim regarding the sufficiency of the

evidence approached frivolity because Goodin's testimony alone was sufficient to convict

him of home invasion.  *See* Petitioner's Pro Per Brief in the Michigan Court of Appeals,

page 37 (attached to the habeas petition).  Goodin, in fact, testified that he and Petitioner

previously discussed committing a larceny or robbery at Snell's house and drove by the

house a few weeks before the incident to "case" it.  Petitioner told Goodin that there was

a large amount of money and drugs in the house.

According to Goodin, on the night in question, they left Goodin's house about 10:00

p.m. to commit the larceny or robbery.  Petitioner made a mask and stenciled "LPD" for

Lansing Police Department on his jacket.  They went to Ignacio Bermudez' house to obtain weapons for the robbery.  The plan was to take money, drugs, and jewelry from the house. Marcus Boles was supposed to go in the house and clear it out so that Petitioner and Goodin could run into the house.  When they arrived at Snell's house, they waited for Boles to come outside.  Then they kicked in the back door to the house.  They proceeded to the basement where they encountered Snell.  Snell shot Goodin, who attempted to disarm Snell and asked Petitioner for help.  Petitioner then shot Snell two times in the back and left the house with all three guns.  Petitioner asked Goodin not to say anything or, if asked, to say that the same person who shot Goodin was the same person who shot Snell.  (Tr. Oct. 12, 2007, at 18-45, 59.)

Petitioner claims that trial counsel allowed the jurors to deliberate a charge that belittled his credibility, was not supported by the evidence, and enhanced Goodin's testimony.  This claim lacks merit because, "[u]nder the *Jackson v. Virginia* standard, a reviewing court does 'not re-weigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury.'"  *United States v. Fisher*, 648 F.3d 442, 450 (6th Cir. 2011) (quoting *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009)) (alterations added).  Furthermore, Goodin's testimony was corroborated by other evidence.  His wife, Seasha Goodin, testified that Petitioner and Goodin left the Goodin household about 10:00 p.m. on the night of the incident and said that they were going to the store.  Petitioner returned about two hours later and said that her husband had been shot and was at the hospital.  Petitioner instructed Seasha not to tell the police what happened and to say that she did not know him.  She blamed Petitioner for the incident because her husband had told her that Petitioner planned the incident and set it up for that Saturday.  (Tr. Oct. 9,

13

2007, at 138-42, 151-52.)

Petitioner's cell phone was found in the Snell residence shortly after the shooting, and when a detective confronted him about the phone, he gave conflicting explanations. He initially told the detective that he lost his cell phone about two weeks before the crime, and he could not explain how the phone happened to show up at the victim's home. When questioned further, he stated that Goodin must have taken the phone. Then, he changed his story again and reverted back to his first story, stating that he lost the phone. (Tr. Oct. 10, 2007, at 212-13.)

Petitioner left the State after being interviewed by the police. When he learned that the police were looking for him, he contacted Detective Christopher Burton and promised to turn himself in within one week. He failed to keep his promise, and he declined to say where he was living, although he did mention that he was worried about being shot if he returned to Michigan. (*Id*. at 85-88.)

A rational juror could have concluded from the evidence taken in the light most favorable to the prosecution that Petitioner and Goodin broke and entered Snell's residence without permission. A rational juror also could have concluded from the evidence that Petitioner was armed when he entered the residence, that he intended to commit a larceny or robbery, and that Snell was present during the break-in. Thus, the elements of first-degree home invasion were satisfied, and the state appellate court's decision was not contrary to, or an objectively unreasonable application, of *Jackson*. Petitioner has no right to relief on the basis of his challenge to the sufficiency of the evidence.

### B. Trial Counsel

Petitioner alleges that his trial attorney's failure to call certain witnesses and make

14

certain objections and requests constituted ineffective assistance of counsel.  The Michigan Court of Appeals determined that, "[o]f the seven alleged errors made by trial counsel, . . . only the failure to ask for an accomplice instruction could conceivably be construed as an actual error" and that "even this error did not result in prejudice . . . ."  *McClain*, 2009 WL 1067375, at *13.  The Michigan Court of Appeals concluded that trial counsel was not ineffective.

### 1.  Clearly Established Federal Law

The Supreme Court's decision in *Strickland v. Washington,* 466 U.S. 668 (1984), is clearly established federal law for purposes of evaluating a claim of ineffective assistance of counsel.  *Cullen v. Pinholster*, __ U.S. __, __, 131 S. Ct. 1388, 1403 (2011).  Pursuant to *Strickland*, Petitioner must demonstrate that trial counsel's "performance was deficient" and "that the deficient performance prejudiced the defense."  *Strickland,* 466 U.S. at 687.

The "deficient performance" prong requires showing that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Strickland*, 466 U.S. at 687.  "Judicial scrutiny of counsel's performance must be highly deferential."  *Id*. at 689.

To demonstrate that counsel's performance prejudiced the defense, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id*. at 694.  "This does not require a showing that counsel's actions 'more likely than not altered the outcome,'" but "[t]he likelihood of a different result must be substantial, not just conceivable."  *Richter*, 131 S. Ct. at 792 (quoting *Strickland*, 466 U.S. at 693).  "The standards created by *Strickland* and

15

§ 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id.* at 788 (internal and end citations omitted).

## 2.  The Failure to Call Three Prisoners as Witnesses

Petitioner contends that his trial attorney should have investigated and called three prisoners (Oliver Bryant, Jay Nielson, and Richard Mallory) as defense witnesses to testify that Goodin committed perjury at Petitioner's trial.  Petitioner states that he informed his retained trial attorney about the witnesses, but his attorney merely said that he would look into it and that Petitioner could not afford to produce the witnesses.  The Michigan Court of Appeals determined that Petitioner was not deprived of a substantial defense and, therefore, counsel's performance was not ineffective.

### a.  Legal Framework

Attorneys have "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691.  The duty to investigate "includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence." *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005).  The relevant question is whether counsel's choices were reasonable. *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000) (citing *Strickland*, 466 U.S. at 688).  Attorneys "may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005). The Supreme Court "has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success." *Knowles v. Mirzayance*,

16

556 U.S. 111, 123 (2009).

### b.  Application

Petitioner claims that Oliver Bryant and Jay Nielson would have testified that they were confined in a holding cell with Goodin and heard Goodin bragging about beating an attempted-murder charge and blaming someone else for the crime.  Richard Mallory allegedly would have testified that he was housed next to Goodin and that Goodin said his friend gave him a cell phone, which he (Goodin) dropped in the house of the man he shot.

Petitioner contends that Bryant, Nielson, and Mallory would have demonstrated that Goodin perjured himself at trial.  Petitioner further contends that the three witnesses collectively would have enhanced his defense that he was somewhere else at the time of the crime and would have diminished the prejudicial impact of the cell phone, which was the only physical evidence linking Petitioner to the crime.

The phone was an important piece of evidence for the prosecution, but Mallory's proposed testimony that Goodin claimed to have dropped the phone probably would not have made a difference in the trial because Petitioner himself offered conflicting stories about the phone to the police.  As noted above, he initially told a detective that he lost his cell phone about two weeks before the crime, and he could not explain how the phone happened to show up at the victim's home.  Although he offered a second explanation stating that Goodin must have taken the phone, he then changed his story again and reverted back to his first story that he lost the phone.  (Tr. Oct. 10, 2007, at 212-13.)  In light of this evidence, Mallory's testimony would have appeared contrived.

Bryant and Nielson's proposed testimony was that Goodin said he was going to "beat" an attempted murder charge and blame the crime on someone else.  Goodin,

17

however, did not "beat" the attempted murder charge.  Before testifying at Petitioner's trial,

Goodin pleaded guilty to assault with intent to murder, as well as, felony firearm and home

invasion.  The fact that he pleaded guilty to the attempted-murder charge would have

undermined Bryant and Nielson's anticipated testimony that Goodin was blaming Petitioner

to avoid being convicted of the crimes.

Defense counsel, moreover, thoroughly cross-examined Goodin and attempted to

show that Goodin was not credible.  He asked Goodin about the different versions of the

facts that he told the police.  (Tr. Oct. 12, 2007, at 49-51, 62, 66-69.)  He also asked

Goodin about some letters in which he supposedly told Petitioner to remain quiet or to say

that some other men came in the house and shot it up while they were there.  (*Id*. at 75,

58.)

Petitioner would not have had a realistic chance of success if his attorney had

investigated and produced Bryant, Nielson, and Mallory as defense witnesses because

"Goodin's testimony as a whole, including that regarding McClain's cell phone, was

subjected to cross-examination, and Goodin's motivation to lie was fully presented to the

jury." *McClain*, 2009 WL 1067375, at *12.  Therefore, trial counsel was not constitutionally

ineffective for failing to investigate and call the three prisoners as witnesses.

### 3.  The Failure to Object to Certain Jury Instructions

### a.  The Instruction on the Defense Theory

Petitioner alleges that trial counsel should have objected when the trial court stated

to the jury, "The defendant says that he is not guilty of home invasion . . . ."  (Tr. Oct. 12,

2007, at 218.)  Petitioner claims that this remark violated his right to an impartial jury and

his right to be presumed innocent.  He also claims that the remark insinuated that the trial

18

court thought the prosecution's proofs were more credible than Petitioner's defense.  The Michigan Court of Appeals stated on review of this claim that, even if it were error not to object, Petitioner failed to show prejudice.

This Court agrees with the Michigan Court of Appeals that the trial court's remark did not prejudice Petitioner's defense.  The trial court informed the jurors at the beginning of trial that nothing it said was meant to reflect its opinion about the facts and that it was the jurors' responsibility to decide both the facts and the credibility of witnesses.  (Tr. Oct. 8, 2007, at 203-04.)  At the close of the case, the trial court stated that its comments and instructions were not evidence and that, when it gave an instruction, it was not trying to influence the jurors' vote or express a personal opinion about the case.  The court then said, "If you believe that I have an opinion about how you should decide this case, you must pay no attention to that opinion.  You are the only judges of the facts, and you should decide this case from the evidence."  (Tr. Oct. 12, 2007, at 210-11.)  The trial court also explained to the jurors that Petitioner was presumed to be innocent.  (*Id*. at 209.)  In light of these instructions, Petitioner's right to be presumed innocent and his right to an impartial jury were not violated.  Therefore, trial counsel was not ineffective for failing to object to the trial court's remark that Petitioner said he was not guilty of the crimes.

### b.  The Instructions on Aiding and Abetting

Petitioner asserts that the jury instruction on aiding and abetting was ambiguous and confusing and that trial counsel should have objected to the instruction.  The trial court stated that, "[a]nyone who intentionally assists someone else in committing a crime is as guilty as the person who directly commits it and can be convicted of that crime as an aider and abettor."  (*Id*. at 218.)  Petitioner takes issue with the subsequent instruction, which

19

states that, to prove guilt on an aiding and abetting theory, the prosecutor must prove:

> First, that the alleged crime was actually committed either by the defendant or someone else. It is does not matter whether any else . . . has been convicted of the crime.

> Second, that before or during the crime the defendant did something to assist in the commission of the crime.

> Third, the defendant must have intended the commission of the crime alleged, or must have known that the other person intended its commission at the time of giving assistance.

(*Id.* at 218.)

> The trial court continued:

> The defendant says that he is not guilty of home invasion, assault with intent to murder, because he did not intend to help anyone commit that offense. It is not sufficient for the prosecutor just to prove that the defendant intended to help another in the common unlawful activity of home invasion and assault with intent to murder. It is necessary that the prosecutor prove beyond a reasonable doubt that the defendant intended to help someone else commit the charged offense of home invasion and assault with intent to murder.

(*Id.* at 218-19.)

Petitioner argues that the trial court's instructions were confusing because the court did not name him or Goodin in the instructions. According to Petitioner, the instructions allowed the jury to convict him as his own accomplice or as a nonexistent third-party accomplice because Goodin pleaded guilty before trial and obviously was the "someone else" mentioned in the instruction. Petitioner also asserts that the instruction on intent erroneously described his defense theory, for intent was not an issue. Instead, his defense was that he was not involved in the crimes.

The Michigan Court of Appeals opined that the trial court's instruction was an accurate reflection of the law on aiding and abetting and that there was no error. "[A] state

court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991), and *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975)).  This Court, moreover, believes that the instructions on aiding and abetting were adequate to protect Petitioner's rights.  And because there was sufficient evidence of aiding and abetting, trial counsel was not ineffective for failing to object to the instructions.

### 4. Failure to Request Certain Jury Instructions

### a. Accomplice Testimony

Petitioner asserts that his attorney should have requested a jury instruction on accomplice testimony because Goodin was the only person to identify him as a participant in the crime.[1]   The Michigan Court of Appeals held that the failure to give the accomplice instruction was not outcome-determinative error, and therefore, Petitioner could not show ineffective assistance.

There was no specific jury instruction on accomplices, but the trial court did give an extensive instruction on judging the credibility of witnesses.  The court advised the jurors to consider whether the witnesses were biased, prejudiced, or had a personal interest in how the case was decided and whether there had been any promises, suggestions, or other influences that affected how the witnesses testified.  The court also advised the jurors

---

[1] Lawrence Calvin Dunn testified that he heard people break in the house, but he immediately took cover behind the bar and closed his eyes.  He did not see the intruders.  (Tr. Oct. 9, 2007, at 32-33, 37, 50.)  Snell testified that he was partially blind at the time and saw only shadows and a little movement.  (Tr. Oct. 10, 2007, at 178, 183, 199.)  Snell's neighbor saw two figures running toward the fence behind Snell's house, but he did not see their faces or recognize them.  (Tr. Oct. 9, 2007, at 63, 65.)

to consider whether the witnesses had a reason to lie.  (Tr. Oct. 12, 2007, at 211-13.)

These instructions were adequate to caution the jury about Goodin's motivation for

testifying as he did.

Even if defense counsel's failure to request a jury instruction on accomplices

amounted to deficient performance, the deficient performance did not prejudice the defense

for the additional reasons given by the Michigan Court of Appeals:

> First, . . . there was corroborating evidence placing McClain at the scene; that
> is, McClain's cell phone and testimony from James Snell, Dunn, and the
> neighbor, who heard or saw more than one person at the house.  And
> McClain himself admits to being with Goodin on the evening of October 23,
> 2006.  Second, potential problems with Goodin's credibility were brought to
> the jury's attention.  During the prosecution's case in chief, Goodin clearly
> explained his plea agreement to the jury. Defense counsel then subjected
> Goodin to thorough cross-examination, in which Goodin admitted that he had
> given the police "two or three" different stories and further commented on the
> plea agreement.

*McClain*, *2009 WL 1067375, at *10.  In conclusion, defense counsel's failure to request

a jury instruction on accomplices did not prejudice the defense and, therefore, did not

amount to ineffective assistance.

### b.  Third-Party Culpability

Petitioner faults his trial attorney for failing to request a jury instruction stating that,

if the jurors had a reasonable doubt as to whether Petitioner was the second intruder, they

should acquit Petitioner.  Petitioner contends that he might have been acquitted of all the

charges if the jury had been instructed on third-party culpability.  The Michigan Court of

Appeals rejected Petitioner's claim on the ground that counsel's failure to request the

instruction did not fall below an objective standard of reasonableness, nor result in

prejudice.

22

Petitioner himself implied that there was not a second intruder.  He claimed that he was riding around while Goodin went in Snell's house, and he denied hearing witnesses testify that there were two people in the house with Snell.  He also could not explain who the other intruder might be, and he said that he really did not know what happened that night.  (Tr. Oct. 12, 2007, at 93, 140-42.)

The trial court, moreover, instructed the jury that the prosecutor had the burden of proving each element of the charged crimes beyond a reasonable doubt and that, if the prosecutor did not prove each element beyond a reasonable doubt, they must find the defendant not guilty.  (*Id*. at 209.)  The jury obviously understood that they could acquit Petitioner, because they found him not guilty of assault with intent to commit murder and felony firearm.  The Court concludes that counsel's failure to request a jury instruction on third-party culpability did not constitute deficient performance and did not prejudice the defense.

### c.  The Alibi Defense

Petitioner testified that he drove Goodin to Snell's residence for the purpose of purchasing cocaine and, after dropping Goodin off, he drove around for about twenty minutes and then picked up Goodin on the street.  He claims that this testimony supported an alibi defense and that his trial attorney should have filed a notice of alibi and requested a jury instruction on the alibi defense.  The Michigan Court of Appeals determined that Petitioner failed to prove his claim because the trial court instructed the jury on home invasion, aiding and abetting, and reasonable doubt.

Failure to investigate and file a notice of alibi can constitute ineffective representation where there is a known and potentially important alibi witness.  *Blackburn*

23

*v. Foltz*, 828 F.2d 1177, 1182-83 (6th Cir. 1987). In this case, Petitioner himself provided the alibi testimony. His specific testimony regarding his whereabouts at the time in question constituted alibi testimony, "the same as if another witness had given the testimony." *People v. McGinnis*, 402 Mich. 343, 346 (1978). Nevertheless, he admitted that he dropped Goodin off at Snell's house, and both Goodin and Seasha Goodin testified that Petitioner planned the crimes. The jurors could have concluded from this evidence that Petitioner aided and abetted Goodin in committing the home invasion, even if they did not believe he was actually present during the actual home invasion. Thus, counsel's failure to file an alibi notice and request an alibi jury instruction likely did not prejudice the defense. The Court of Appeals reasonably concluded that Petitioner did not prove his claim.

### 5. Failure to Object to the Prosecutor's Remark

As noted, Goodin pleaded guilty to the crimes for which he and Petitioner were charged. He was not sentenced before Petitioner's trial. His plea agreement required the prosecutor to recommend a sentence at the low end of the sentencing guidelines. The agreement also required the trial court to consider departing downward from the sentencing guidelines if Goodin cooperated in other cases. (Tr. Oct. 12, 2007, at 11-12.) During closing arguments, the prosecutor stated that the trial court could sentence Goodin to "whatever he wants." (*Id.* at 180). Petitioner alleges that this remark was erroneous because the trial court was required to sentence Goodin under the Michigan sentencing guidelines and could not impose any sentence it wanted to impose. According to Petitioner, the prosecutor's remark was a ploy to bolster Goodin's truthfulness, and the remark implied that the prosecutor had special knowledge about the sentencing process. Petitioner asserts

24

that defense counsel should have objected to the remark.

The Michigan Court of Appeals stated that the prosecutor made a true statement about Goodin's plea agreement.  The Court of Appeals concluded that Petitioner did not prove prejudice and, therefore, he failed to prove his claim of ineffective assistance of counsel.

In Michigan, state courts generally are obligated to follow the sentencing guidelines, Mich. Comp. Laws § 769.34(2), but a court may depart from the guidelines "if the court has a substantial and compelling reason for that departure . . . ."  Mich. Comp. Laws § 769.34(3).  The prosecutor therefore was correct in recognizing that the trial court had considerable discretion in sentencing Goodin.

The trial court, moreover, informed the jurors that the attorneys' arguments were not evidence and were only meant to help them understand the evidence and the way each side saw the case.  The trial court advised the jurors to base their verdict only on the evidence. (Tr. Oct. 8, 2007, at 203; Tr. Oct. 12, 2007, at 210.)  For these reasons, trial counsel's failure to object to the prosecutor's remark did not amount to deficient performance and did not prejudice the defense.

### 6.  The Combination of Errors

Petitioner contends that the combined effect of his trial attorney's errors assured his conviction because the trial was a credibility contest between Goodin and him.  Petitioner urges the Court to presume that trial counsel's omissions prejudiced the defense, pursuant to *United States v. Cronic*, 466 U.S. 648 (1984).  The Michigan Court of Appeals concluded on review of this claim that the cumulative effect of the errors did not deprive Petitioner of a fair trial.

25

"*Cronic* recognized a narrow exception to *Strickland's* holding that a defendant who asserts ineffective assistance of counsel must demonstrate not only that his attorney's performance was deficient, but also that the deficiency prejudiced the defense." *Florida v. Nixon*, 543 U.S. 175, 190 (2004). *Cronic* "applies when 'there [is] a breakdown in the adversarial process,' such that 'counsel entirely fails to subject the prosecution's case to meaningful adversarial testing.'" *Wright v. Van Patten*, 552 U.S. 120, 124 n.1 (2008) (*per curiam* opinion quoting *Cronic*, 466 U.S. at 662 and 659). But the attorney's failure to test the prosecution's case must be complete before prejudice may be presumed. *Id*. (citing *Bell v. Cone*, 535 U.S. 685, 696-97 (2002)).

Petitioner's trial attorney cross-examined witnesses and produced one witness besides Petitioner to testify for the defense. Trial counsel also made an opening statement, objected at appropriate times during trial, and gave a closing argument in which he maintained that Goodin was not credible and that the prosecution had failed to meet its burden of proof. Because trial counsel subjected the prosecution's case to meaningful adversarial testing, there was not a breakdown in the process, and *Cronic's* presumption of prejudice does not apply.

### C.  Appellate Counsel

Petitioner's final claim alleges that Eaton County's system of compensation for criminal defense attorneys during appeals as of right is inadequate and, therefore, his appellate attorney very likely could not provide reasonably effective assistance. More specifically, Petitioner contends that his appellate attorney was constitutionally ineffective for failing to raise a claim about Petitioner's trial attorney.

The Michigan Court of Appeals stated on review of Petitioner's claim about appellate

26

counsel that the claim failed because Petitioner was unable to show any prejudice.  As for the alleged lack of funding, the Court of Appeals noted that Petitioner offered no specific reasons why Eaton County's system of compensation was unreasonable, and, because appellate counsel was not ineffective, the issue of compensation for public defenders was not before the court.

The *Strickland* test for ineffective assistance of trial counsel (deficient performance and prejudice) applies to claims about appellate counsel.  *Smith v. Robbins*, 528 U.S. 259, 285 (2000).  To prove the deficient-performance prong of *Strickland*, Petitioner must show that his appellate attorney was objectively unreasonable in failing to raise nonfrivolous issues on appeal.  *Id*.  To satisfy the prejudice prong, Petitioner must demonstrate a reasonable probability that he would have prevailed on appeal were it not for his attorney's unprofessional errors.  *Id*.

> Failure of appellate counsel to raise an issue on appeal can amount to constitutionally ineffective assistance.  *McFarland* [*v. Yukins*, 356 F.3d 688, 710 (6th Cir. 2004)].  Yet, counsel has no obligation to raise every possible claim and "the decision of which among the possible claims to pursue is ordinarily entrusted to counsel's professional judgment."  *Id*.  An appellate attorney is not required to raise a non-meritorious claim.  *See Wilson v. Mitchell*, 498 F.3d 491, 514–15 (6th Cir. 2007).

*Jalowiec v. Bradshaw*, 657 F.3d 293, 321-22 (6th Cir. 2011), *petition for cert. filed*, No. 11-9704 (U.S. Apr. 3, 2012).

Petitioner raised his claims about trial counsel in a *pro se* supplemental brief.  The Michigan Court of Appeals found no merit in the claims, and this Court agrees that trial counsel was not constitutionally ineffective.  Consequently, appellate counsel was not ineffective for failing to raise the claims about trial counsel.  "[B]y definition, appellate counsel cannot be ineffective for a failure to raise an issue that lacks merit."  *Greer v.*

*Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001). And because appellate counsel was not ineffective, the Court need not determine Eaton County provides adequate funding for indigent defendants on appeal.

## IV. CONCLUSION

For all the reasons given above, the decision of the Michigan Court of Appeals was not contrary to Supreme Court precedent, an unreasonable application of Supreme Court precedent, or an unreasonable determination of the facts. Accordingly, the petition for writ of habeas corpus is **DENIED**.

## V. CERTIFICATE OF APPEALABILITY AND THE APPELLATE FILING FEE

"[A] prisoner seeking postconviction relief under 28 U.S.C. § 2254 has no automatic right to appeal a district court's denial or dismissal of the petition. Instead, [the] petitioner must first seek and obtain a [certificate of appealability.]" *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).


A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "It is consistent with § 2253 that a [certificate of appealability] will issue in some instances where there is no certainty of ultimate relief. After all, when a [certificate of appealability] is sought, the whole premise is that the prisoner 'has already failed in that endeavor.'" *Miller-El*, 537 U.S. at 337 (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). When, as here, the district court "rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v.*

*McDaniel*, 529 U.S. 473, 484 (2000).  "[A] claim can be debatable even though every jurist of reason might agree, after the [certificate of appealability] has been granted and the case has received full consideration, that [the] petitioner will not prevail."  *Miller-El*, 537 U.S. at 338.

Reasonable jurists could debate the Court's assessment of Petitioner's claims that trial counsel was ineffective for failing to (1) call three prisoners to impeach Goodin's testimony, (2) request a jury instruction on accomplice testimony, and (3) file a notice of alibi and request a jury instruction on an alibi defense.  Consequently, a certificate of appealability may issue on those claims, and Petitioner may proceed *in forma pauperis* on appeal.  The Court declines to issue a certificate of appealability on Petitioner's remaining claims because reasonable jurists would not disagree with the Court's resolution of those claims, nor conclude that the issues deserve encouragement to proceed further. *Miller-El,* 537 U.S. at 327.

**IT IS ORDERED.**

S/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  May 18, 2012

The undersigned certifies that a copy of this document was served on the attorneys of record and Larry McClain by electronic means or U.S. Mail on May 18, 2012.

S/Linda Vertriest
Deputy Clerk